IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

AUG 2 7 2007

U.S. DISTRICT COURT
_____ BURG, WV 26301

SUSAN W. COGAR,
          Plaintiff,

v.
                               Civil Action No. 2:06cv40
                               (Judge Maxwell)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
          Defendant.

## REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on the parties' cross Motions for

Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b).

### I. Procedural History

Susan W. Cogar ("Plaintiff") filed her application for SSI on May 30, 2002 (protective filing

date), alleging disability beginning October 1, 1999,[2] due to fibromyalgia, chronic fatigue syndrome,

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

[2] Plaintiff filed a previous application for SSI with an onset date of October 1, 1999. That application went through the Administrative Process, being ultimately denied by the ALJ on April 18, 2002. Plaintiff filed a Complaint in this Court, and the ALJ's decision was ultimately

bursitis, dropped bladder, sciatic nerve in left hip, and arthritis (R. 152). The application was denied

initially and on reconsideration (R. 98, 99). Plaintiff requested a hearing, which Administrative Law

Judge ("ALJ") Barbara Gibbs held on December 18, 2003 (R. 31). Plaintiff, represented by counsel,

testified on her own behalf, along with Vocational Expert Eugene Czuczman ("VE"). By decision

dated January 7, 2004, ALJ Gibbs denied benefits (R. 28). The Appeals Council received additional

evidence from Plaintiff but denied Plaintiff's request for review on March 8, 2006, rendering the

ALJ's decision the final decision of the Commissioner (R. 7).

## II. Statement of Facts

Plaintiff was born on February 28, 1953, and was 50 years old years old at the time of the

ALJ's decision (R.36). She went to school to the 11th grade, quitting to get married. She later

obtained her GED. Her only past work was as a personal care provider (R. 143).

On April 22, 2002, Plaintiff saw rheumatologist Wassim Saikali, M.D. for a follow up of

fibromyalgia and chronic pain syndrome (R. 261). She had been treating with Dr. Saikali for over

a year for these conditions. She continued to complain of multiple joint pain and discomfort with

muscle soreness associated with stiffness in the neck, shoulders and arms. She had no swelling in

her joints, but had mild tenderness in the trapezia, nuchal area, and lateral epicondyle. The diagnosis

was fibromyalgia with mild improvement and chronic pain syndrome. Dr. Saikali prescribed

neurontin and baclofen and advised Plaintiff do stretching exercises.

On April 27, 2002, Plaintiff underwent a regular checkup with her treating physician, Cynthia

Osborne (R. 242). Plaintiff complained of nausea and having problems eating for the past three

___

upheld by this Court on September 21, 2006. See Docket Entry 22 Case No. 2:04cv9
(N.D.W.Va. 2006). The Court therefore considers evidence only after the ALJ's decision of
April 18, 2002.

months. Dr. Osborne diagnosed fibromyalgia, hypertension, and allergic rhinitis.

On May 6, 2002, Plaintiff presented to Dr. Osborne for complaints of "stomach problems" (R. 241). The diagnosis was nausea and abdominal pain. The doctor referred Plaintiff for an Upper GI series, which came back as normal (R. 252).

On May 29, 2002, Plaintiff presented to Dr. Osborne for complaints of on and off stomach pain, some nausea, and increased fibromyalgia symptoms with decreased sleep and increased pain (R. 239). She was diagnosed with fibromyalgia and abdominal pain.

On July 22, 2002, Plaintiff saw Dr. Saikali for follow up of fibromyalgia and chronic pain syndrome (R. 260). She continued to complain of increased generalized pain and discomfort involving the neck, shoulders and back, associated with stiffness and soreness. Baclofen seemed to help and neurontin seemed to help, but she was still having pain. She said the Wellbutrin was not helping much. Upon examination there was no active swelling or synovitis. She had tenderness in the trapezia, nuchal area, and lateral epicondyle. Dr. Saikali diagnosed fibromyalgia and chronic pain syndrome "[m]ade worse by her depression not doing well." He cut down on the Wellbutrin and prescribed Prozac. He also advised her to do stretching exercises and learn stress management.

On July 31, 2002, Plaintiff presented to Dr. Osborne with complaints of "more knots on R hand/painful @ times, thumb itching, some burning, stomach still with problems that are about the same" (R. 238). Dr. Osborne diagnosed fibromyalgia, abdominal adhesions, hypertension, and depression.

On September 30, 2002, Plaintiff had a bone density scan which was normal (R. 248). That same date she presented to Dr. Osborne with complaints of "just doesn't feel well. Bad day today; a lot of aches and pains; good/bad days" (R. 237). She also complained of a possible pinched nerve,

bladder urgency/frequency; a sprained right ankle; and choking spells. Dr. Osborne diagnosed fibromyalgia, right ankle sprain, and back pain. She prescribed Depo Medrol, and diet and exercise.

On October 14, 2002, Plaintiff saw Dr. Osborne with complaints of sinus drainage and congestion with headache and pressure (R. 236). Dr. Osborne diagnosed sinusitis, headache, and fibromyalgia.

On October 22, 2002, Plaintiff saw Dr. Saikali for her fibromyalgia and chronic pain syndrome (R. 258). She continued to complain of generalized aches and pains involving her neck, shoulders and back, associated with stiffness and soreness. Klonopin helped, but she did not like the Prozac. She would try to take 2 Wellbutrin a day. She was still reporting mood swings with good days and bad days, but no crying spells. Upon examination, Plaintiff had no active swelling in the MCP's, PIP's, wrists or elbows. She had tenderness in the trapezia, nuchal area, and lateral epicondyle. Dr. Saikali's diagnosis remained fibromyalgia and chronic pain syndrome.

On November 26, 2002, Plaintiff presented to Dr. Osborne, stating she had been "doing well with no new complaints" (R. 235). The diagnosis remained fibromyalgia and hypertension.

On January 27, 2003, Plaintiff presented to Dr. Osborne for a check up (R. 233). Dr. Osborne found Plaintiff obese. Plaintiff complained of hand and wrist numbness and back pain. Dr. Osborne diagnosed fibromyalgia, hypertension, osteoarthritis, and GERD.

On August 12, 2002, State agency reviewing psychologist Joseph Kuzniar, Ph.D., completed a Psychiatric Review Technique form ("PRT") based on Listing 12.04, Affective Disorders (R. 208). Dr. Kuzniar found Plaintiff had depression characterized by sleep disturbance, decreased energy, and difficulty concentrating or thinking, but that the impairment was not severe. He found she would have only mild restriction of activities of daily living; mild difficulties in maintaining social

4

functioning; mild difficulties in maintaining concentration, persistence or pace, and had had no episodes of decompensation, each of extended duration (R. 218). Dr. Kuzniar then concluded:

> The MER doesn't support a marked level of functional limitation and does not contribute significantly to being disabled as stated in the treating physician statement.

(R. 220).

On August 13, 2002, State agency reviewing physician Hugh M. Brown, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC") based on a primary diagnosis of Fibromyalgia and Chronic Fatigue Syndrome and complaints of fibromyalgia, chronic fatigue syndrome, bursitis, dropped bladder, sciatic nerve in left hip, and arthritis (R. 222). He opined Plaintiff could occasionally lift 20 pounds and could frequently lift 10 pounds. She could stand and/or walk at least two hours in an eight-hour workday and could sit about six hours in an eight-hour workday. She could occasionally perform all posturals.

Dr. Brown expressly considered Dr. Osborne's opinion of October 30, 2001, and Dr. Saikali's opinion that Plaintiff was disabled due to the severity of the pain and fibromyalgia and depression. He concluded that he agreed with the treating physicians, opining that Plaintiff could tolerate sedentary work.

On August 27, 2002, Plaintiff presented to Dr. Richard Topping, M.D. for her complaints of a 30-plus-year history of bilateral hand problems (R. 232). She complained of clumsiness, stiffness and numbness; and noticed knots on the right ring and long finger. She tried splinting but no other treatment. She had never undergone a nerve conduction study. She occasionally had some neck pain. Dr. Topping noted her history was complicated by fibromyalgia.

Upon examination Plaintiff's cervical spine had limited extension. Flexion and rotation were without difficulty. She had tenderness in both trapezium muscles. She had no tenderness in the

posterior mid-elements, no reproduction of symptoms with axial loading or range of motion; no thenar or hypothenar atrophy of the hands; normal Allens' test; normal sensation to all digits; negative thumb grind and negative Finkelstein; positive Tinel over the median nerve and negative over the ulnar nerve; positive Phalen's; a very large tendon sheath ganglion at the base of the ring finger; and a small ganglion at the base of the long finger.

Dr. Topping found that Plaintiff had "fairly classical carpal tunnel syndrome, which has been persistent for thirty plus years." She had no relief with conservative treatment. She also developed apparent ganglions in her right hand. He recommended nerve conduction studies, which came back as normal (R. 231). Plaintiff continued to complain of numbness and tingling in her hands and also some lower extremity complaints of pain and numbness. Dr. Topping ordered an MRI.

On November 19, 2002, Dr. Topping wrote that Plaintiff's cervical MRI was normal with no evidence of stenosis or disk herniation. Her lumbar MRI demonstrated a left paracentral L5-S1 herniation with impingement of the left S1 nerve root. He offered referral to a spine surgeon or pain clinic, but Plaintiff preferred to continue with conservative care. Dr. Topping opined that Plaintiff exhibited classic carpal tunnel despite the negative studies and suggested carpal tunnel surgery. Plaintiff again preferred to continue with conservative care.

On February 6, 2003, Plaintiff saw Dr. Saikali for follow up or her fibromyalgia and chronic pain syndrome (R. 258). She continued to complain of joint pain and discomfort in the hands, neck, and back, associated with stiffness. She did not take the prescribed Zyprexa because it caused mood swings and she also worried she would gain more weight (she had already been diagnosed with obesity). Klonopin and Wellbutrin were helping, but she felt significant pain and discomfort when sitting or standing for a long time. Upon examination there was no swelling or synovitis. There was tenderness in the trapezia and nuchal area. The diagnosis was again fibromyalgia and chronic pain

6

syndrome. The doctor again advised her to do stretching exercises and lose weight.

On March 14, 2003, State agency reviewing physician Fulvio Franyutti, M.D. completed an RFC based on Plaintiff's fibromyalgia, carpal tunnel syndrome, and ganglion of the hands (R. 263). He opined she could occasionally lift ten pounds, frequently lift ten pounds, stand/walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday. She could occasionally perform all posturals. She should avoid concentrated exposure to extreme cold and hazards. Dr. Franyutti opined that Plaintiff's RFC was reduced to sedentary due to fibromyalgia, carpal tunnel syndrome, ganglion cysts, pain, slow gait, hand weakness, and fatigue (R. 268). He noted that Dr. Osborne had limited Plaintiff to sedentary work due to fatigue and pain, and expressly agreed with that opinion (R. 269).

On March 25, 2003, State agency reviewing psychologist James Capage, Ph.D., completed a PRT based on 12.04, affective disorders, finding that Plaintiff had depression treated with psychotropic medications, but that the impairment was not severe (R. 271). He expressly found that the MER did not support a significant contribution by a mental impairment to the treating physician's statement of disability. He opined that Plaintiff had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and had had no episodes of decompensation, each of extended duration (R. 281).

On May 12, 2003, Plaintiff followed up with Dr. Osborne, with complaint of bad headaches and dizziness (R. 322). She complained her back was "bad today" and she had had "an episode" where she couldn't feel her legs. The doctor noted she looked tired. She also noted a neurology consult found no problems. Dr. Osborne diagnosed fibromyalgia, back pain with radiculopathy, and

right leg weakness.

On June 2, 2003, Plaintiff saw Dr. D'Amato, D.O. regarding her complaints of chronic back pain (R. 311). She reported had had the pain for 35 years. About six or eight months earlier she began experiencing right leg numbness and weakness. Nothing helped. Upon examination, Plaintiff had stiffness in her low back. Flexion and extension did not cause sciatic pain. There was no weakness of the plantar flexors or great toe extensors. There was stocking-like hypoesthesia of the right leg from the knee down. Straight leg raising was negative and Patrick's maneuver was negative.

Dr. D'Amato reported that Plaintiff's MRI showed a left posterior paracentral herniated disc with left S1 nerve root impingement, but then noted her symptoms were on the right. He also noted that Plaintiff had "had these symptoms for many years, and she does not desire surgical intervention. She is not a surgical candidate." Dr. D'Amato said he would therefore treat Plaintiff conservatively with medication and therapy.

Dr. D'Amato wrote to Plaintiff's treating physician:

Her past medical history is significant for numerous problems. The medication list includes drugs too numerous to mention. Her Oswetry index is 58. Her patient pain drawing shows inappropriately placed symbols suggesting symptom magnification.

On July 14, 2003, Plaintiff saw Dr. Osborne with complaints of lump in throat, ears plugged, and leg numbness due to back pain with difficulty walking. Dr. Osborne described Plaintiff as having an antalgic gait and having trouble arising. The diagnosis was chronic back pain and dysphagia. Dr. Osborne prescribed a cane.

On August 12, 2003, Plaintiff followed up with Dr. Saikali regarding her fibromyalgia and chronic pain syndrome (R. 331). She complained of generalized aches and pain in the neck, back,

8

and shoulders, associated with stiffness. The pain was moderate in nature, requiring Lortab. Wellbutrin, Klonopin and Neurontin were "helping." She had degenerative nodules in the fingers of both hands with no swelling or synovitis. She had tenderness in the trapezia, nuchal area, and lateral epicondyle. Dr. Saikali diagnosed fibromyalgia, chronic pain syndrome, and osteoarthritis. He advised her "to do the physical therapy and stretching exercises."

On October 28, 2003, Plaintiff underwent an endoscope for her complaints of "a lump in her throat and dysphagia to solids." She was determined to have a mild peptic stricture and mild gastritis. She underwent a dilation of the esophagus which she tolerated well.

Dr. Osborne completed a general physical for the State DHHR, on November 3, 2003, noting that Plaintiff's posture and gait were normal (R. 329). She had diffuse chronic pain with decreased range of motion in the lumbo-sacral and lumbar spine. Plaintiff's pain was described as "constant pain somewhere– some days pain worse– insomnia due to pain." Dr. Osborne's primary diagnoses were fibromyalgia and chronic fatigue syndrome with a minor diagnosis of degenerative disc disease. Dr. Osborne opined Plaintiff could not perform any full time work due to "pain/fatigue."

On November 17, 2003, Plaintiff saw Dr. Osborne, reporting having a "bad day" with increased pain (R. 316). She reported the lump sensation in her throat was better since she had the procedure. Dr. Osborne noted Plaintiff looked "uncomfortable today." She diagnosed fibromyalgia, GERD, and fatigue.

On November 12, 2003, Plaintiff followed up with Dr. Saikali regarding her fibromyalgia and chronic pain syndrome (R. 334). She reported continued pain and discomfort, generalized, involving her hands, knees, neck and back and associated with stiffness. She reported being tired and fatigued and hurting all over. She also complained of right shoulder pain – a dull ache

9

associated with stiffness. She said physical therapy and exercises did not help. She was not sleeping well at night.

Upon examination, Plaintiff had no active swelling or synovitis, but had tenderness in the trapezia, nuchal area, and lateral epicondyle. Dr. Saikali diagnosed fibromyalgia and chronic pain syndrome. He again advised her to do stretching exercises.

On November 6, 2003, Plaintiff underwent a psychological evaluation at the request of her counsel (R. 285). The examination was performed by Christy Gallaher, M.S., supervised by Michael Morrell, M.S., a licenced psychologist. Plaintiff reported having fibromyalgia, chronic fatigue syndrome, disc pressing a nerve in back and degenerative disease in back, along with arthritis, sciatic nerve in left hip, and bursitis in right shoulder. She stated she was not able to hold a steady job due to these medical problems and was therefore applying for disability. She described her family finances as "poverty stricken." Her husband had his own business as a mechanic, and they received a medical card and food stamps.

Plaintiff had never seen a psychiatrist, but saw a therapist four or five times about 30 years earlier. She reported trouble falling asleep and staying asleep, sleeping an average of five to six hours per night. She reported no recent nightmares. She reported very poor energy. She said she had had suicidal thoughts and one attempt as a teenager, but not currently.

Plaintiff reported she needed to sit to do dishes and cook. She used a cane when she vacuumed. Her husband helped with the housework. She used to do a lot of knitting and crocheting, but not much anymore, although she still did some quilting.

Upon Mental Status Examination, Plaintiff received a score of 29, normal being between 24 and 30 (R. 287). She was appropriately dressed and groomed, alert, polite and friendly, maintained

good eye contact, and showed no evidence of confusion or lack of awareness. Her conversation was coherent, speech was spontaneous, and mode of expression was commensurate with her sociocultural level and intellectual function. She was fully oriented, could recall two out of three objects after several minutes, and her immediate, recent and remote memories were good. Attention and concentration was fair. She could repeat seven digits forward and six backward. She could follow verbal and written commands. Thinking was concrete. Affect was appropriate. Mood was euthymic and judgment and insight appeared fair. Her IQ scores were all in the 90's, in the average range of intellectual functioning. Her reading and spelling were at high-school level and her math was at the seventh grade level.

Assessment of the personality validity scales indicated a likely valid profile, but the psychologists noted that it showed some symptom exaggeration was possible. Otherwise it indicated she may report feeling nervous, tense, worried, sad and depressed; may experience somatic symptoms such as fatigue, exhaustion, physical weakness, and gastrointestinal complaints; may lack interest and involvement; and may appear passive, docile, and dependent.

The Bender Visual Motor Gestalt Test indicated adequate perceptual motor functioning. The Beck Depression Inventory indicated severe depression. The Beck Anxiety Inventory indicated severe anxiety.

The psychologists' diagnosis was mood disorder, not otherwise specified; and rule out psychotic disorder. Her Global Assessment of Functioning ("GAF") was assessed at 55. [3]

---

[3]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

The psychologists completed a Mental Residual Functional Capacity Assessment ("MRFC"), finding Plaintiff would have a slight limitation in understanding, remembering, and carrying out instructions and exercising judgment and making decisions; a moderate limitation in sustaining attention and concentration for extended periods, maintaining regular attendance and punctuality, and completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; moderate limitations in interacting appropriately with the public, responding appropriately to direction and criticism from supervisors, and working in co-ordination with others without being unduly distracted by them or distracting them; maintaining acceptable standards of courtesy and behavior; demonstrating reliability; relating predictably in social situations in the workplace without exhibiting behavioral extremes and ability to be aware of normal hazards and take appropriate precautions; carrying out an ordinary work routine without special supervision; setting realistic goals and making plans independently of others; and traveling independently in unfamiliar places. She would have a marked limitation in her ability to respond to changes in the work setting or work process and ability to tolerate ordinary work stresses.

The psychologists also completed a PRT based upon affective disorder. They opined Plaintiff would have a moderate restriction of activities of daily living, moderate difficulties maintaining concentration, persistence or pace, and marked difficulties maintaining social functioning. She had no episodes of decompensation (R. 307).

On November 17, 2003, Plaintiff saw Dr. Osborne, reporting was having a "bad day" with increased pain (R. 316). Dr. Osborne noted Plaintiff "looked uncomfortable today." She diagnosed fibromyalgia, GERD, and fatigue.

**Evidence to Appeals Council.**

After the ALJ's decision of January 7, 2004, Plaintiff submitted evidence to the Appeals Council, including:

Treatment records from Dr. Osborne from January 12, 2004 - September 20, 2005

Report by Dr. Osborne dated March 9, 2004.

Treatment records from Dr. Saikali dated March 11, 2004- Aug 16, 2004.

Treatment records from Seneca Health Services dated April 9, 2004 - June 27, 2005.

WV DHHR Report of General Physical by Dr. Osborne dated January 3, 2005.

WV DHHR Disability/Incapacity evaluation dated January 24, 2005.

Treatment records by Dr. Yancy Short dated July 7, 2005 -November 10, 2005.

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the prior decision.

2. The claimant's fibromyalgia, chronic fatigue syndrome, and lumbar degenerative disc disease are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 20 CFR Part 404).

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant has the residual functional capacity to perform light work with a sit/stand option requiring postural activities occasionally but no climbing ropes, scaffolds, ladders and no stair climbing once on the job, and with bending limited to only to [sic] the degree necessary to touch the knees. The claimant should avoid

concentrated exposure to extreme cold and hazards, such as unprotected heights and dangerous machinery, and she should be allowed to use a pillow behind the back when seated.

6. The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

7. The claimant is an "individual closely approaching advanced age" (20 CFR § 416.963).

8. The claimant has a "high school equivalent education" (20 CFR § 416.964).

9. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (10 CFR § 416.968).

10. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

11. Although the claimant's exertional and nonexertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.14 and 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as an information clerk, a storage facility/rental clerk, or a cleaner/polisher.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR § 416.920(f)).

(R. 27-28).

## IV. The Parties' Contentions

Plaintiff contends:

1.    The ALJ failed to find all of the plaintiff's severe impairments, impermissibly "fragmentized" the impairments, and despite conclusory findings stating otherwise, did not consider the synergistic effects of the many physical and psychological manifestations of fibromyalgia, and chronic fatigue syndrome throughout all stages of the sequential evaluation process. Further, the ALJ found no severe mental impairments at all.

2.    The ALJ utilized an improper credibility standard.

3.    The ALJ ignored the statements of the plaintiff's husband in evaluating the plaintiff's credibility.

14

4.      The ALJ failed without sufficient cause to give appropriate deference to the opinions of the treating physicians.

5.      The ALJ relied upon an incomplete, inaccurate hypothetical RFC assumption to the VE which did not include all of the plaintiff's non-exertional limitations resulting from fatigue, pain, depression, and medication effects and failed to explain her failure to rely upon the favorable testimony of the VE in response to questions which were consistent with the plaintiff's diagnoses, plaintiff's statements and testimony, statements of plaintiff's husband, and opinions of both treating physicians Osborne and Saikali [later reinforced by opinions of treating psychiatrist Urick].

6.      The Appeals Council failed to review the claim and find that the new evidence submitted from the treating physician, treating rheumatologist, treating psychiatrist and mental health clinic was "material" and called into question the ALJ's findings regarding the severity of the mental impairment during the period prior to the ALJ decision and regarding the lack of weight afforded to the Cardinal Psychological Evaluation.

Defendant contends:

1.      The ALJ's evaluation of Plaintiffs impairments at each step of the sequential evaluation process was properly based upon the medical evidence in accordance with SSR 99-2p and the controlling regulations.

2.      The ALJ accepted that Plaintiff's carpal tunnel syndrome, gastroesophageal reflux disease, hypertension, and mood disorder were medically determinable impairments at step two. He then concluded that Plaintiff's mild gastritis, managed hypertension and mild mood disorder were not shown to create significant limitations on Plaintiff's vocational ability and were therefore not severe.

3.      Plaintiff's allegation regarding the credibility analysis is without merit.

4.      The ALJ was not required to give deference to Dr. Osborne's and Dr. Saikali's conclusory disability opinions based only on Plaintiff's complaints of fatigue and pain.

5.      Plaintiff's contention that the ALJ's hypothetical question to the VE was incomplete is baseless.

6.      As determined by the Appeals Council, some of the post-hearing evidence submitted by Plaintiff was duplicative and not significantly different from Plaintiff's treating physicians' earlier opinions; and any new evidence regarding recent treatment for depression was properly found to refer to a period after the ALJ's decision.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Severe and Medically-Determinable Impairments

The undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled, although not particularly for the reasons argued by the Plaintiff. In Acquiescence Ruling ("AR") 00-1(4), SSA held:

> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, the adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact

relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

When the previous finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increased. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks . . . An adjudicator should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years . . . . In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

In the case at bar, on April 18, 2002, Administrative Law Judge Steven Slahta entered a decision finding that Plaintiff had the severe impairments of fibromyalgia, chronic pain syndrome, depression, borderline intellectual functioning, high blood pressure, carpal tunnel syndrome, allergies, facet arthropathy, and GERD (R. 85). Plaintiff's borderline intellectual functioning was based on a psychological evaluation performed on January 2002, which found valid IQ scores of verbal 87; performance 79; and full scale 85. That same evaluation showed Plaintiff had major depressive disorder, recurrent moderate, without psychotic features.

ALJ Slahta found Plaintiff retained the residual functional capacity to perform light work with a sit-stand option requiring no repetitive bending, performing work in a clean air environment, doing entry level, unskilled, routine-repetitive, low stress work involving simple one-two instructions and tasks and involving things rather than people (R. 89).

Plaintiff filed her second application for SSI only about one month after ALJ Slahta's

decision. The second Administrative Law Judge, Barbara Gibbs, found Plaintiff's only severe impairments were fibromyalgia, chronic fatigue syndrome, and lumbar degenerative disc disease. She did not allow for any mental limitations in her RFC. ALJ Gibbs did note that the previous decision "also found depression, borderline intellectual functioning, hypertension, carpal tunnel syndrome, facet arthropathy, and gastroesophageal reflux disease to be severe impairments," but found "[t]he medical evidence of record in the current case does not support a finding that any of these impairments significantly limit the claimant's physical or mental ability to do basic work activities." This finding appears to be more of a disagreement with ALJ Slahta's previous decision than a finding based on the evaluation required in the Acquiescence Ruling. For example, ALJ Gibbs cited a second psychological evaluation performed on November 6, 2003, which indicated higher IQ's, as evidencing "a significant improvement in the claimant's cognitive functioning since the prior decision." (R. 19). The undersigned agrees that the numbers alone do appear to reflect a "significant improvement in [Plaintiff's] cognitive functioning," but there is no discussion or reasoning given for the difference. The ALJ neither discussed the discrepancy nor called into question the validity of the earlier test. There may have actually been an improvement in Plaintiff's cognitive functioning on the test due to improvement in pain or psychological factors, but this would be mere speculation on the Court's part. There was no discussion about validity of either test. The first test was considered valid by the psychologists who gave the test as well as by the first ALJ. It was performed in January 2002, only a few months before Plaintiff's second application. Here, however, the ALJ "apparently accepted the validity of the second test over the first and attributed the [] increase in [Plaintiff's] IQ to 'medical improvement.'" See Muncy v. Apfel, 247 F.3d 728, 73 Soc. Sec. Rep Serv. 471 (8th Cir. 2001). Further, even if Plaintiff's borderline intellectual

functioning had improved, there is no evidence when it improved. The first evaluation was performed in January 2002, and the second in November 2003, meaning Plaintiff still may have had a severe mental impairment of borderline intellectual functioning for almost two years.

Administrative Law Judge Gibbs also found that Plaintiff's depression/anxiety were no longer severe, as had been found in the earlier decision. She found that Plaintiff's depression/anxiety had significantly improved, based on her not seeking or received any specialized mental health treatment or counseling since the first evaluation; her being prescribed Wellbutrin and Klonopin by her treating rheumatologist "primarily for fibromyalgia and not currently for depression/anxiety;" the fact that Dr. Saikali's treatment records since April 2002, did not list depression/anxiety as a diagnostic impression and he reported good response to the medication; that claimant reported on May 6, 2003, that her depression was better; and that Dr. Osborne no longer listed depression as a diagnosis or complaint in the welfare disability form dated November 3, 2003. These findings are not entirely correct, however. In July, 2002, Dr. Saikali expressly diagnosed fibromyalgia and chronic pain syndrome "[m]ade worse by her depression not doing well." He prescribed Prozac. That same month, Dr. Osborne also diagnosed depression. Again, even if Plaintiff's depression was no longer severe as of May 2003, there is still a time during the entire year prior to that, and since her application, that her impairment may still have been severe.

The undersigned finds the ALJ did not follow the requirements of AR 00-1(4) in determining that Plaintiff's severe impairments were no longer severe or that her RFC had changed. She was required to consider ALJ Slahta's findings as evidence and give them appropriate weight in light of all relevant facts and circumstances. ALJ Gibbs did not discuss: (1) whether the fact on which the prior finding was based was subject to change with the passage of time; (2) the likelihood of such

19

a change, considering the length of time that has elapsed between the period previously adjudicated and period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provided a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Most significantly, however, the undersigned notes that the previous ALJ found Plaintiff to have the severe impairment of chronic pain syndrome. Administrative Law Judge Gibbs totally omits any discussion of chronic pain syndrome, even though Dr. Saikali consistently diagnosed Plaintiff with chronic pain syndrome throughout the two years he treated her (before the first ALJ decision and subsequently in April, July, October, 2002, and February, April, and November 2003, all after her second application). There is therefore no support for a determination omitting chronic pain syndrome as a severe impairment or at least a medically determinable impairment, even if the first ALJ had not considered it at all. The undersigned finds this omission especially significant because chronic pain syndrome is defined by the National Institute of Health as follows:

> While acute pain is a normal sensation triggered in the nervous system to alert you to possible injury and the need to take care of yourself, chronic pain is different. Chronic pain persists. Pain signals keep firing in the nervous system for weeks, months, even years. There may have been an initial mishap - - sprained back, serious infection -- or there may be an ongoing cause of pain - - arthritis, cancer, ear infection - - but some people suffer continuing pain in the absence of any past injury or evidence of body damage. Many chronic pain conditions affect older adults. Common chronic pain complaints include headache, low back pain, cancer pain, arthritis pain, neurogenic pain (pain resulting from damage to the peripheral nerves or to the cental nervous system itself), psychogenic pain (pain not due to past disease or injury or any visitable sign of damage inside or outside the nervous system.)

National Institute of Neurological Disorders and Stroke at www.ninds.nih.giov/disorders/chronic-pain.htm.

Importantly, even if any of the above-referenced impairments were found to be only

medically-determinable and not severe, the ALJ would still be required to consider them throughout the remainder of the evaluation. See 20 CFR § 416.923.

For all the above reasons, the undersigned finds substantial evidence does not support ALJ Gibbs' determination regarding Plaintiff's severe and medically-determinable impairments.

## C. Credibility

Because the undersigned United States Magistrate Judge has already determined that substantial evidence does not support Administrative Law Judge Gibbs' findings regarding Plaintiff's severe and medically-determinable impairments, it follows that the ALJ's credibility analysis is also not supported by substantial evidence. In particular, the omission of chronic pain syndrome from the discussion may mistakenly lead to a finding that Plaintiff's complaints of pain were not credible because they were not supported by objective medical evidence. As the NIH reports, chronic pain syndrome may result in pain that is not due to past disease or injury or any visible sign of damage inside or outside the nervous system. For that reason alone the undersigned finds substantial evidence does not support the ALJ's credibility finding.

Plaintiff also argues that the ALJ erred by not following SSR 99-2p, regarding chronic fatigue syndrome ("CFS") in evaluating her credibility. Administrative Law Judge Gibbs expressly found that Plaintiff had the severe impairment of chronic fatigue syndrome. She was therefore required to follow the ruling in her evaluation. SSR 99-2p provides:

> [I]f the existence of a medically determinable impairment that could reasonably be expected to produce the symptoms has been established, as outlined above, but an individual's statements about the intensity, persistence, or functionally limiting effects of symptoms are not substantiated by objective medical evidence, the adjudicator **must consider all of the evidence in the case record including any statements by the individual and other persons concerning the individuals' symptoms**. The adjudicator must then make a finding on the credibility of the individual's statements about symptoms and their functional effects. When

additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, **the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements.**

. . . **Third party information . . . may be very useful in deciding the individual's credibility**. Information other than an individual's allegations and reports from the individual's treating sources helps to assess an individual's ability to function on a day-to-day basis and to depict the individual's capacities over a period of time. **Such evidence includes, but is not limited to . . . information from neighbors, friends, relatives, or clergy.** . . . **The adjudicator should carefully consider this information when making findings about the credibility of the individuals's allegations regarding functional limitations or restrictions**.

(Emphasis added). While the undersigned does not believe the ALJ was required to accord Plaintiff's husband's statements any significant weight, the undersigned does agree with Plaintiff that the ALJ erred by failing to at least address the statements, which corroborated Plaintiff's own allegations regarding her symptoms and limitations, pursuant to the Acquiescence Ruling.

The undersigned therefore finds substantial evidence does not support the ALJ's credibility determination.

### D. RFC

Because the undersigned United States Magistrate Judge has already found that substantial evidence does not support the ALJ's findings regarding Plaintiff's medically-determinable and severe impairments nor her credibility finding, it follows that substantial evidence also does not support ALJ Gibbs' Residual Functional Capacity Assessment ("RFC"). Additionally, however, the undersigned finds the substantial evidence would not support the RFC even if the credibility analysis was proper. The ALJ found that treating physician Osborne's opinion was not supported by "the objective clinical signs, the clinical signs in the treatment notes, or the other objective medical evidence of record." ALJ Gibbs also found treating rheumatologist Saikali's opinion was not

supported by the objective medical evidence. She therefore rejected both treating physicians'

opinions. In addition, however, the ALJ completely rejected the State agency reviewing physicians'

opinions that Plaintiff was limited to sedentary work (R. 25). She therefore rejected every medical

opinion in the record since the last ALJ decision.

On August 13, 2002, Hugh M. Brown M.D. opined that "it appear[ed] the claimant could

tolerate sedentary work activity" (R. 228). On March 14, 2003, Fulvio Franyutti M.D. opined that

Plaintiff would be limited to sedentary work due to fatigue and pain, agreeing with treating physician

Osborne's opinion. 20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency
> medical or psychological consultants, or other program physicians or psychologists.
> However, State agency medical or psychological consultants, or other program
> physicians or psychologists, are highly qualified physicians and psychologists who
> are also experts in Social Security disability evaluations. Therefore, administrative
> law judges must consider findings of State agency medical or psychological
> consultants, or other program physicians or psychologists, as opinion evidence,
> except for the ultimate determination about whether you are disabled.

Because the ALJ rejected every medical opinion in the record, including the State agency

physicians', the undersigned "considers the decision of the [ALJ] to have been without foundation

when [she] substituted [her] opinion for that of the [physicians]. Oppenheim v. Finch, 495 F.2d 396

(4th Cir. 1974).

The undersigned further finds the ALJ's reliance on AR 00-1(4) , in determining

Plaintiff could work at the light exertional level, is misplaced. The ALJ supported this finding as

follows:

> [T]he objective medical evidence of record discussed previously does not show
> significant deterioration in her physical condition since the prior decision less than
> two years earlier, in which it was found that the claimant retained the capacity to
> perform light work with a sit/stand option. Therefore, significant weight is given to
> the light residual functional capacity with a sit/stand option found in the prior

decision. Acquiescence Ruling 00-1(4).

(R. 25). Although the prior decision was indeed entered "less than two years earlier," the State agency physician opinion on which that decision relied was made a year earlier, in May 2001. In fact, none of the evidence addressed in the instant Report and Recommendation existed at the time of the first ALJ's decision. As stated in the Acquiescence Ruling:

> In determining the weight to he given [] a prior finding, the adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and period being adjudicated in the subsequent claim; and (3) **the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim**.

(Emphasis added). Further:

> When the previous finding was about a fact which is subject to change with the passage of time, **such as a claimant's residual functional capacity**, or that a claimant does or does not have an impairment(s) which is severe, **the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increased**. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks . . . **An adjudicator should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years** . . . . In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

The undersigned therefore finds the Acquiescence Ruling does not support the ALJ's reliance on the prior decision in this case.

For all the above reasons the undersigned finds substantial evidence does not support the ALJ's RFC.

24

## E. Hypothetical to the VE

Plaintiff next argues: "The ALJ relied upon an incomplete, inaccurate hypothetical RFC assumption to the VE which did not include all of the plaintiff's non-exertional limitations resulting from fatigue, pain, depression, and medication effects and failed to explain her failure to rely upon the favorable testimony of the VE in response to questions which were consistent with the plaintiff's diagnoses, plaintiff's statements and testimony, statements of plaintiff's husband, and opinions of both treating physicians Osborne and Saikali [later reinforced by opinions of treating psychiatrist Urick]." Because the undersigned has already found that substantial evidence does not support the ALJ's finding regarding Plaintiff's severe and medically-determinable impairments, her credibility, or her RFC, it follows that substantial evidence does not support the hypothetical to the VE.

## F. Evidence Submitted to the Appeals Council

Plaintiff also argues: "The Appeals Council failed to review the claim and find that the new evidence submitted from the treating physician, treating rheumatologist, treating psychiatrist and mental health clinic was 'material' and called into question the ALJ's findings regarding the severity of the mental impairment during the period prior to the ALJ decision and regarding the lack of weight afforded to the Cardinal Psychological Evaluation."

Because the undersigned has already determined that substantial evidence does not support the ALJ's finding regarding Plaintiff's severe and medically-determinable impairments, her credibility, her RFC, or her reliance on the VE's response to the hypothetical, it follows logically that substantial evidence does not support the Appeals Council's refusal to reconsider the ALJ's decision. Additionally, because the undersigned has already found that this case must be remanded to the Commissioner for further proceedings, there is no need to further address the additional evidence

submitted to the Appeals Council. Upon remand both parties shall be able to submit any evidence, including that submitted to the Appeals Council, they deem relevant to the issues.

## VI. Recommendation

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket Entry 13] be **DENIED**, and Plaintiff's Motion for Summary Judgment [Docket entry 12] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _27_ day of August, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE